IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CARL D. GLOVER,

          Plaintiff,

                                   CV 3:10-CV-00824-PK

                                   FINDINGS AND

v.                                   RECOMMENDATION


MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff Carl D. Glover filed this action July 15, 2010, seeking judicial review of the

Commissioner of Social Security's final decision denying his applications for disability insurance

benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social

Security Act (the "Act").  This court has jurisdiction over plaintiff's action pursuant to 42 U.S.C.

§ 405(g) and 1383(c)(3).

Page 1 - FINDINGS AND RECOMMENDATION

Glover argues that the ALJ erroneously rejected the opinion of his treating physician, that the ALJ erred by failing to develop the record regarding Glover's anxiety and depression, that the ALJ improperly rejected lay witness testimony, and that the ALJ improperly assessed Glover's residual functional capacity and thus improperly analyzed step five of the five-step sequential process for analyzing a Social Security claimant's entitlement to benefits. I have considered the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's final decision should be reversed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the ALJ finds that the claimant has engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b). Otherwise, the evaluation will proceed to the second

Page 2 - FINDINGS AND RECOMMENDATION

step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. §§ 404.1520(e),

416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets its burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566, 416.920(a)(4)(v), 416.920(g),

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet its burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id., citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of the Commissioner. *See id., citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Glover was born December 16, 1963. Tr. 272.[2] He received a General Educational

Development high school equivalency diploma and has received no subsequent formal education.

Tr. 34. According to Glover's records of wages earned, since his claimed disability onset date of

January 2, 2004, Glover was self employed in 2004 (earning $5695.00), worked for his sister's

company Windows Floors & More in 2005 (earning $3675.00), worked for his sister in an

undisclosed position in 2006 (earning $131.25), and worked for Roque Valley Stations Inc. In

2007 (earning $226.20). Tr. 117.

The administrative record does not contain extensive medical records dating from prior to

January 2, 2004, Glover's claimed disability onset date. Various records nevertheless indicate

that Glover was involved in a motorcycle accident in the 1980's resulting in a left pelvic fracture,

although the record contains no records contemporaneous with the accident. Tr. 227

The earliest medical report appearing in the administrative record is dated June 24, 2004.

Tr. 346. On that date Glover met with Debbie Cheevers, F.N.P., to establish a primary care

provider. Tr. 346. At that appointment, Glover complained of low back pain and left hip pain,

and said the pain does inhibit him from working. Tr. 346. At this initial visit, Cheevers

prescribed Zoloft for anxiety and decreased Glover's Vicodin dosage. At a follow-up visit on

July 8, 2004, Cheevers added a diagnosis of anxiety and depression. Tr. 345. At a follow-up

visit on July 22, 2004, Glover noted that his pain was not well controlled on the decreased

Vicodin dosage and he would like to increase it, to which Cheevers agreed. Tr. 343.

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 11.

On July 26, 2004, Glover was referred to Northwest Spine and Pain Center where he met with George Johnston, D.O., for evaluation of his back and hip pain. Tr. 259. Dr. Johnston said that Glover's gait was antalgic and slightly unsteady, and that he was able to toe walk and heel walk with some instability and showed instability on tandem gait. Tr. 259. Dr. Johnston noted that Glover's lumbar spine range of motion was diminished in both extension and flexion, with increased pain in both directions. Tr. 259. Plaintiff's lower extremities exhibited strength of 5/5 throughout. Tr. 259. Glover's straight leg raise was positive for tight hamstrings bilaterally and the left straight leg raise produced low back pain without radicular symptoms at 45 degrees. Tr. 259. Dr. Johnston's impression was that Glover suffered from low back pain and trochanteric bursitis, and he ordered imaging of the lumbar spine and left hip. Tr. 259-60. This imaging showed good alignment of the spine and no evidence for spondylolysis or spondylolisthesis. Tr. 257. This imaging also revealed evidence of previous repair in the pelvis, as well as mild to minimal degenerative changes in both hips and both SI joints. Tr. 257. At a follow up visit on August 3, 2004, Dr. Johnston performed interspinous ligament injections to ease Glover's low back pain. Tr. 255. Patient stated the injections gave him 10-20% relief of his back pain. Tr. 251.

On August 10, 2004, Glover called Northwest Spine and Pain Center, stating that he had lost his Vicodin and Ativan and would like a refill. Tr. 253. Northwest Spine declined to refill Glover's prescriptions. Tr. 253. Two days later at a follow-up visit with Cheevers, Glover again stated he had lost his medication and requested a refill. Tr. 338. Cheevers declined to refill Glover's Vicodin, but did refill his Ativan for anxiety. Tr. 339. Later that evening Glover went to the Ashland Community Hospital ER and requested Vicodin, which was declined. Tr. 339. In

November 2004, Glover continued his ligament injections at Northwest Spine, and requested that he be put on Percocet instead of Vicodin because he had a new job that involved bending, twisting, and lifting and the Vicodin was not as effective anymore. Tr. 248. Dr. Johnston agreed to switch Glover from Vicodin to Percocet. Tr. 248. Glover stated that his upper leg and lower back pain were about 80% improved as a result of the injections. Tr. 334.

On January 24, 2005, Glover underwent an MRI of the lumbar spine which revealed mild annular bulges at L4-5 and L5-S1 and a minimal disk bulge at L3-4. Tr. 261. Dr. Johnston saw no focal disk protrusion and the neural foramina were patent and the facet joints appeared normal. Tr. 261. On February 8, 2005, Dr. Johnston noted that Glover was in a very physically demanding job and encouraged him to look for less physically demanding work. Tr. 246. On February 17, 2005, Glover saw Cheevers for a refill of his Ativan and Zoloft for depression. Tr. 332. Glover reported that his depression was improved with these medications and he was getting out and socializing, his energy level was good and his appetite was good. Tr. 332. Throughout 2005, Glover saw Dr. Johnston and Don Bowser, A.N.P., at Northwest Spine on a monthly basis, reporting the same complaints and refilling his medication. Tr. 216-47.

On August 11, 2005, Glover met with Tom Hazel, F.N.P., at the Ashland Community Health Center to discuss issues of medication. Tr. 324. Glover stated he was originally placed on Ativan (a benzodiazepine) seven years ago in response to a seizure and he increases the amount he takes when he feels shaky or anxious. Tr. 324. At this visit Hazel doubted the presence of depression in Glover and diagnosed him with benzodiazepine addiction. Tr. 323. Hazel believed Glover's symptoms of anxiety were actually from this benzodiazepine addiction, and initiated a plan to wean Glover off of the Ativan. Tr. 323. Glover also denied ever having

symptoms of depression and stated that the antidepressants he had been taking did not provide relief from his feelings of anxiety. Tr. 324.

On October 5, 2005, Glover reported to the Rogue Valley Medical Center emergency room complaining of left leg and back pain as a result of slipping on his floor and doing the splits. Tr. 266. He was given Vicodin and released. Tr. 266. At an October 17, 2005, follow-up visit with Hazel regarding his seizure disorder, Glover stated that he did not cut back on his Ativan usage. Tr. 321. Hazel tried to indirectly bring up Glover's back pain and his recent ER visit to see if Glover would mention these things, but Glover made no mention of either. Tr. 320.

On December 1, 2005, Glover reported to the Providence Medford Medical Center with back pain at 10/10 that he aggravated moving furniture. Tr. 208. He was given Percocet and discharged. Tr. 209. Two days later, Glover reported to Rogue Valley Medical Center emergency room complaining of hip pain from painting all day and going up and down a ladder. Tr. 264. He was given Vicodin, but told by the emergency room FNP that he needed to direct these concerns to his primary care provider in the future. Tr. 264.

On March 27, 2006, State agency medical consultant Dr. Martin Kehrli reviewed Glover's medical record in making a disability determination. Tr. 273-280. Dr. Kehrli concluded that Glover had the ability to occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. Tr. 274. Dr. Kehrli found that despite Glover's claims of limited function, the evidence indicated that he was capable of physical exertion inconsistent with a finding of disability. Tr. 278. Upon reconsideration in August 2006, State agency non-examining medical consultant Neal Berner, M.D., affirmed Dr. Kehrli's findings. Tr. 354.

On March 29, 2006, State agency psychiatric consultant Bill Hennings, Ph.D., reviewed Glover's medical records and determined that Glover suffered from a panic disorder and a depressive disorder. Tr. 284-86. Dr. Hennings found that these impairments were non-severe because they caused no degree of limitation under any of the "B" criteria. Tr. 291. Dr. Hennings noted that Glover's symptoms of depression and anxiety seem to be well controlled with his medication. Tr. 293. Upon reconsideration in August 2006, State agency non-examining psychological consultant Paul Rethinger, Ph.D, affirmed the non-severe determination of Dr. Hennings. Tr. 355.

In June and July of 2006, Glover twice reported to the Ashland Community Health Center requesting early refills of his Ativan because he had over-taken his medication. Tr. 302, 306. On July 3, 2006, Hazel recommended that Glover withdraw from narcotics and wrote "The patient did not like this information, but essentially admitted the dependence and poor behaviors and overusing meds . . . ." Tr. 302. Hazel also noted that Glover's charts contain multiple ER visits for pain at which he did not indicate that he was on narcotic medications. Tr. 302. There is no indication in the record that Glover ever returned to the Ashland Community Health Center after receiving Hazel's recommendation. Tr. 302-467.

From August 4, 2006 to September 24, 2007, Glover's medical history contains only records from the Ashland Community Hospital (ACH). Tr. 429-446. There is no record of Glover visiting with a primary care provider in this time. During this time Glover made six visits to the emergency room, complaining of abdominal pain, hip pain, and Ativan withdrawal. Tr. 429-446. An emergency room doctor at ACH did not prescribe narcotics for Glover during one visit because his chart indicated this was to be done only through his primary care provider. Tr.

Page 10 - FINDINGS AND RECOMMENDATION

445.

The first record of Glover meeting with a new primary care provider is from September 24, 2007, with Pedro Bujosa M.D., at Providence Medical Group in Medford. Tr. 377. At this visit Glover stated his back and hip pain was at a level of four on a ten-point scale. Tr. 377. Dr. Bujosa increased his Oxycontin dosage and put him on Celexa for depression and anxiety. Tr. 377. At a follow-up visit on October 18, 2007, Bujosa noted that Glover's depression and anxiety were not well controlled as it was a "bad time of year," but that his back pain was well controlled. Tr. 374. On December 5, 2007, Glover complained to Dr. Bujosa of diarrhea and vomiting because he abruptly stopped taking his Oxycontin, which Glover claimed was lost during a move. Tr. 372. Dr. Bujosa diagnosed Glover with drug withdrawal and prescribed him a withdrawal drug but declined to give him an early refill of Oxycontin. Tr. 372. At a follow up two weeks later, Glover reported an increase in back and hip pain as a result of being without his pain medication. Tr. 370. On January 11, 2008, Dr. Bujosa recorded that Glover's pain was well controlled with his current medication.

At a June 3, 2008 visit, Dr. Bujosa diagnosed Glover with degenerative disk disease and noted that Glover felt very anxious and suffered anxiety and agoraphobia related attacks. Tr. 400. At this visit Glover recounted that any kind of heavy lifting, pulling, pushing, stooping, or bending aggravated his back and hip pain. Tr. 400. On June 27, 2008, Glover reported to the ACH emergency room for increased neck pain caused when he helped a friend move boxes. Tr. 423. Glover did not mention Oxycontin as one of his current medications and was given Vicodin for his pain. Tr. 423.

On August 25, 2008, Glover was admitted to the ACH emergency room with upper left

quadrant chest pain. Tr. 405. Glover was diagnosed with a pulmonary embolism and discharged three days later. Tr. 405. At a follow-up visit with Dr. Bujosa on September 15, 2008, Glover stated that he had no chest pain, but he continued to have back and hip pain. Tr. 393. On September 30, 2008, Dr. Bujosa wrote a letter opining that Glover's history of chronic pain and anxiety, as wells as his recent pulmonary embolism symptoms "make it difficult for him to work." Tr. 392.

In October 2008, Glover presented to the ACH emergency room with complaints of chest pain. Tr. 449. Glover had run out of pain medication prior to this visit and attending physician Steven Hersch, M.D., noted the chest pain may have been an exacerbation of Glover's generalized pain syndrome. Tr. 450.

In November 2008, Glover presented to the ACH emergency room with complaints of chest pain, a rash, and a headache. Tr. 461. A CT scan of his brain showed no abnormality. Tr. 467. The treating physician diagnosed Glover's headache as a "likely neck tension headache." Tr. 459. Glover's chest pain dissipated and he was discharged from the hospital after two days. Tr. 459.

### SUMMARY OF ALJ FINDINGS

The Administrative Law Judge noted in his March 27, 2009 opinion that Glover's claimed disability onset date was January 2, 2004, for both his DIB and SSI applications. Tr. 13. At the first step of the five-step sequential evaluation process, the ALJ found that Glover did not engage in substantial gainful activity at any time following his claimed disability onset date. Tr. 15. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Glover's medical impairments of "degenerative

Page 12 - FINDINGS AND RECOMMENDATION

disc disease of the lumbar spine, degenerative joint disease of the hips bilaterally, depressive disorder, and anxiety disorder" were "severe" for purposes of the Act. Tr. 15. Because the impairments were deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Glover's impairments were the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 19-20. The ALJ therefore properly conducted an assessment of Glover's residual functional capacity. Specifically, the ALJ found that during the relevant adjudication period Glover had:

> the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of about 6 hours in an 8 hour workday, and sit for a total of about 6 hours in an 8 hour workday. The claimant is limited to unskilled work with no more than occasional public contact.

Tr. 21. In reaching this finding, the ALJ considered all of the material objective medical evidence in the record, as well as opinion evidence. Tr. 21-23.

At the fourth step of the five-step process, the ALJ found that Glover was unable to perform his past relevant work. Tr. 23-24.

At the fifth step, the ALJ found in light of Glover's age, education, work experience, and RFC, that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 24-25. Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled, sedentary jobs that Glover could perform despite the limitations listed in his RFC, occupations including hand stuffer (280,000 jobs in the national economy and 8,000 jobs in the Oregon economy) table worker (147,000 jobs in the national economy and 1,800 jobs in the Oregon economy) or assembler of small products (280,000 jobs in the national economy and 8,000 jobs in the Oregon economy). Tr. 24. Based on the finding that

Glover could perform jobs existing in significant numbers in the national economy, the ALJ

concluded that Glover was not disabled as defined in the Act at any time between January 2,

2004, and March 27, 2009. Tr. 25.


### ANALYSIS

**I.      Residual Functional Capacity**

Glover challenges the Commissioner's assessment of his residual functional capacity.

Specifically, Glover argues that the ALJ improperly rejected the September 30, 2008, medical

opinion of Glover's treating physician Bujosa.  Glover also argues that the ALJ erred by failing

to develop the record regarding Glover's "severe" anxiety and depression.  Glover further argues

that the ALJ improperly rejected lay witness testimony without a valid reason.  Additionally,

Glover argues that the ALJ improperly found that plaintiff can stand for up to six hours a day,

improperly rejected any pace or production limitations identified by the plaintiff and his witness

from the RFC, improperly failed to develop the record regarding plaintiff's difficulty with using

his hands, and improperly rejected the ALJ's findings regarding plaintiff's limitations in

concentration, persistence or pace from the RFC findings.  Finally, Glover argues that the

Commissioner failed to carry his burden at the fifth step of the five-step process in light of the

alleged errors in the ALJ's assessment of Glover's RFC.

**A.      September 30, 2008, Medical Opinion of Treating Physician Bujosa**

Pedro Bujosa, M.D., was Glover's treating physician for lower back and hip pain from

September 2007 through at least November 17, 2008.  On September 30, 2008, Bujosa wrote a

letter regarding Glover, opining that:

Page 14 - FINDINGS AND RECOMMENDATION

> Mr. Glover has a history of chronic hip pain as well as chronic back pain and even problems with anxiety which make it difficult for him to work. Recently, he has also developed a pulmonary embolism which has made it even more difficult for him to work secondary to shortness of breath that was caused by this pulmonary embolism.

Tr. 392.  Glover argues that the Administrative Law Judge improperly rejected Bujosa's opinion.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians.  *See* 20 C.F.R. § 404.1527(d)(2). Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques and is not inconsistent with other substantial evidence in the medical record, the treating physician's opinion is accorded controlling weight.  *See id.*  Moreover, even where a treating physician's opinion is contradicted by competent medical evidence, it is still entitled to deference. *See id.*; *see also, e.g., Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating physician's opinion is contradicted by medical evidence in the record it is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting* S.S.R. No. 96-2p, 1996 SSR LEXIS 9.  In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Notwithstanding the foregoing, no such deference is afforded a treating physician's opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. However, medical opinions from a treating physician or any other source may not be simply

Page 15 - FINDINGS AND RECOMMENDATION

ignored, even when they bear upon issues reserved to the Commissioner, but rather must be

evaluated to determine the extent to which they are supported by evidence in the record. *See*

S.S.R. No. 96-5p, 1996 SSR LEXIS 2. Although the Commissioner is required to evaluate every

medical opinion, the Commissioner is only required to discuss "significant probative evidence"

in his detailed findings. *Vincent on behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th

Cir. 1984) (controverted medical opinion found to be neither significant nor probative), *quoting*

*Cotter v. Harris*, 642 F.2d 700, 706 (3rd Cir. 1981).

> Here, the ALJ addressed Bujosa's letter opinion of September 30, 2008, as follows:

> The only medical opinion on record regarding the claimant's ability to work was
> made by Dr. Bujosa following the claimant's pulmonary embolism. Dr. Bujosa
> stated that the claimant would have difficulty working due to his chronic pain,
> anxiety, and pulmonary embolism. This opinion did not provide any objective
> findings for what would limit the claimant's ability to work. This opinion also did
> not provide actual limitations [*sic*] his abilities that would suggest an inability to
> work. Because there was no basis provided and no objective findings present, the
> Administrative Law Judge rejects Dr. Bujosa's statement.

Tr. 23.

Although Bujosa's letter opinion of September 30, 2008, indicates that Glover has a

history of chronic pain in his hip and back, as well as current shortness of breath cause by the

development of a pulmonary embolism, it states only Bujosa's belief that Glover's symptoms

"make it *difficult* for [Glover] to work" rather than Bujosa's opinion that Glover would be *unable*

to sustain any long-term employment. Tr. 392 (emphasis supplied). Even if fully credited,

Bujosa's letter opinion of September 30, 2008, therefore provides no basis for the conclusion that

a finding of disability is warranted: to establish disability within the meaning of the Act, a

claimant must demonstrate an "*inability* to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months," and not merely that it would be *difficult* to sustain gainful employment. 42 U.S.C. § 423(d)(1)(A) (emphasis supplied). As such, Bujosa's letter opinion is not probative of the ultimate issue of Glover's disability. *See Vincent*, 739 F.2d at 1394-1395, *quoting Cotter*, 642 F.2d at 706.

The ALJ properly evaluated Glover's chronic hip and back pain by relying on the testimony of the state agency medical consultants, but improperly omitted from the RFC Glover's chest pain and shortness of breath due to pulmonary embolism. However, this omission was no more than harmless error. Glover complained of shortness of breath on only one occasion. Tr. 417. Glover's complaints of chest pain were intermittent and his pain worsened when he ran out of pain medication. Tr. 449. At his monthly visits with Dr. Bujosa subsequent to his pulmonary embolism, Glover made no mention of chest pain. Tr. 380, 385. In light of this, Glover's complaints of chest pain and shortness of breath would not prevent him from doing the jobs identified by the vocational expert. Those jobs require minimal physical exertion and would not implicate Glover's reported chest pain or shortness of breath.

For the foregoing reasons, the Commissioner's decision should not be disturbed on the basis of the ALJ's rejection of Bujosa's opinion testimony.

**B.      Failure to Develop the Record Regarding Plaintiff's Anxiety and Depression.**

The claimant bears the burden of proof to establish disability. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir 2001). The ALJ, however, "has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, at 1288 (9th 1996). This duty exists even when the claimant is represented by counsel, *id.,*

Page 17 - FINDINGS AND RECOMMENDATION

yet it arises "only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes*, 276 F.3d at 459-60. Glover argues that the ALJ had a duty to develop the record regarding Glover's anxiety and depression.

Here, the ALJ had sufficient evidence to assess Glover's anxiety and depression. As discussed above, substantial evidence in the record supports the ALJ's contention that the record was complete regarding Glover's anxiety and depression. In order to qualify as disabled, plaintiff's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. *See* 20 C.F.R. § 404 Subpt. P, App. 1 § 12.04. "Marked" means more than "moderate" but less than "extreme." *Id.* at § 12.00. Based on the medical record the ALJ concluded that Glover has mild restriction in the activities of daily living and only moderate difficulties with social functioning and concentration, persistence, or pace. Because this conclusion was unambiguous in light of the medical record and the non-examining state agency psychologists' assessments, the ALJ did not have a duty to develop the record further and the ALJ's decision should not be disturbed on the basis of plaintiff's argument to the contrary.[3]

### C.    Rejection of Lay Witness Testimony

Glover argues that the ALJ improperly rejected the testimony of lay witness Nelda Fuller,

---

[3] The court also notes that claimant asked for the record to be kept open for thirty days, which the ALJ allowed, so that claimant could secure a source statement from Dr. Bujosa regarding Claimant's ability to work. Claimant did not request additional time to develop the record regarding specific functional limitations or his anxiety and depression.

plaintiff's sister. Specifically, Glover argue the ALJ improperly rejected Fuller's testimony

regarding his pace or production limitations, as well as her testimony regarding Glover's ability to

use his hands. The ALJ was correct in rejecting Fuller's testimony on these issues because it was

inconsistent with the medical record.

"Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take

into account, unless he or she expressly determines to disregard such testimony and gives reasons

germane to each witness for doing so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

Inconsistency with the medical evidence constitutes a germane reason for a court to reject lay

testimony. *Id.* Friends and family members in a position to observe a claimant's symptoms and

daily activities are competent to testify as to her condition. *Dodrill v. Shalala*, 12 F.3d 915,

918–19 (9th Cir. 1993). While a witness who views the claimant on a daily basis can often tell

whether someone is suffering or merely malingering, the testimony of those who see the claimant

less often still carries some weight. *Id* at 919. Where a lay witness statement is similar to the

claimant's own subjective complaints, however, the ALJ may reject the witness statements for the

same reasons that the ALJ discounted the claimant's testimony, as long as the ALJ properly

discredited the claimant's testimony. *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694

(9th Cir. 2009).

Here, the ALJ properly rejected the testimony of lay witness Fuller, although he

improperly characterized her testimony as "parroting". The ALJ found the witness' statements

were consistent with Glover's own reports and testimony, but reasoned that "[s]ince the reporting

of the claim is not found to be credible for reasons noted herein, the parroting of those allegations

by witnesses only slightly enhances that reporting." Tr. 22. The ALJ mischaracterizes the

Page 19 - FINDINGS AND RECOMMENDATION

witnesses statements.  Far from "parroting" Glover's allegations, the witness described

independent observations of Glover's physical condition.  *See, e.g.,* Tr. 47 (Fuller stating that

Glover "had trouble in his hips, pain down his legs.  He couldn't work but a few minutes at a time

and have to stop").  However, the ALJ was correct in rejecting Fuller's testimony because it was

inconsistent with the medical record.  Two state agency medical consultants found that Glover

did have the ability to work an eight-hour workday.  *See* Tr. 274.  Contrary to Fuller's testimony,

the state agency physicians found that Glover had no significant loss of strength or sensation, and

that he remained capable of physical exertion.  Tr. 275, 278.

### D.    Glover's Credibility

Glover argues that the ALJ improperly rejected his testimony regarding his limitations in

pace or production, as well as his testimony regarding his difficulty using his hands.  The ALJ

properly rejected Glover's testimony.

When a claimant's medical record establishes the presence of a "medically determinable

impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other

symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those

symptoms.  20 C.F.R. § 404.1529.  In weighing a claimant's credibility, the ALJ conducts a

two-step analysis.  Under step one, the claimant "must produce objective medical evidence of an

underlying impairment" or impairments that could reasonably be expected to produce some

degree of symptom.  *Tommasetti v. Astrue,* 533 F.3d 1035, 1939 (9th Cir. 2008), *quoting Smolen

v. Chater,* 80 F.3d 1273, 1281-82 (9th Cir. 1996).  If the claimant meets this threshold and there

is no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the

severity of her symptoms only by offering specific, clear and convincing reasons for doing so."

*Id.*, quoting *Smolen*, 80 F.3d at 1281, 1283-84. In evaluating a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

Here, the ALJ found Glover's testimony not fully credible because there were numerous signs he was exhibiting drug-seeking behavior, and because of the severe lack of consistency in his statements to different providers. Thus, the ALJ properly rejected Glover's testimony by offering specific and convincing reasons for discrediting him.

### E.    Plaintiff's Ability to Stand for Six Hours a Day

Glover argues there is no evidence he can stand for up to six hours a day. While it is true that no treating or examining physician has commented on Glover's ability in this regard, two state agency medical consultants found that he can stand for up to six hours a day. The ALJ properly cited to the medical record in making the determination regarding Glover's ability to stand. Tr. 23. Thus, there is sufficient evidence to support the ALJ's finding that Glover can stand for up to six hours a day.

**F.     Rejection of Plaintiff's limitations in concentration, persistence or pace in the RFC findings.**

Glover argues that the ALJ improperly failed to include Glover's limitations in concentration, persistence, or pace in the RFC findings. In his decision, the ALJ found the claimant had "moderate" difficulties with regard to concentration, persistence, or pace. *See* Tr. 20. These limitations were not included in the RFC findings and not included in the hypotheticals posed to the vocational expert. A hypothetical posed to a vocational expert must include all of a claimant's functional limitations. *See Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995). However, the ALJ's omission of Glover's moderate limitations in concentration, persistence, or pace from the RFC findings was harmless error. Mistakes in a vocational expert's hypothetical which are nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion are considered to constitute harmless error. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

The ALJ found that Glover could perform work as a hand stuffer, a table worker, or an assembler of small products. If the ALJ had included Glover's moderate limitations in concentration, persistence, or pace into his RFC findings, the ALJ could still have made the same findings. The only cognitive requirements for those positions require the worker to have low to markedly-low aptitude abilities. (learning ability, verbal aptitude, numerical aptitude, spacial aptitude). Requirements for ability in concentration, persistence, or pace are not included in and cannot be implied from the Dictionary of Occupational Titles's job descriptions. *See* DOT #780.687-046; #734.687-014; #706.684-022. The Commissioner's decision therefore should not be disturbed on the basis of the ALJ's failure to include Glover's moderate limitations in

concentration, persistence, and pace in the RFC.

## II.    Deficient Step-Five Findings

Glover argues that the ALJ's erroneous assessment of his residual functional capacity resulted in error at the fifth step of the sequential process.  As discussed above, the ALJ overall properly framed Glover's RFC and his failure to include moderate limitations in concentration, persistence and pace was harmless.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Page 23 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons set forth above, the Commissioner's final decision in connection with Glover's applications for DIB and SSI benefits should be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 25th day of July, 2011.

Honorable Paul Papak
United States Magistrate Judge